UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>        - v.-<br><br>ABH NATURE'S PRODUCTS, INC., ABH PHARMA, INC., STOCKNUTRA.COM, INC., and MOHAMMED "Md." JAHIRUL ISLAM,<br><br>                    Defendants. | COMPLAINT<br><br>Civil Action No.<br>2:19-CV-06589<br><br>(DeArcy Hall, J.)<br>(Mann, M.J.) |

Plaintiff, the United States of America, by and through its undersigned counsel, and on behalf of the United States Food and Drug Administration ("FDA"), hereby alleges as follows:

## INTRODUCTION

1.      This is a statutory injunction proceeding brought under the Federal Food, Drug, and Cosmetic Act (the "Act"), 21 U.S.C. § 332(a), and the inherent equitable authority of this Court, to preliminarily and permanently enjoin ABH Nature's Products, Inc., ABH Pharma, Inc., and StockNutra.com, Inc. (together, the "Corporate Defendants"), and Mohammed "Md." Jahirul Islam (together with the Corporate Defendants, "Defendants"), from:

    A.     violating 21 U.S.C. § 331(a) by introducing or delivering for introduction, or causing to be introduced or delivered for introduction, into interstate commerce articles of food (dietary supplements, within the meaning of 21 U.S.C. § 321(ff)), that are adulterated under 21 U.S.C. § 342(g)(1);

    B.     violating 21 U.S.C. § 331(k) by causing articles of food (dietary supplements, within the meaning of 21 U.S.C. § 321(ff)), to become adulterated under 21 U.S.C.

1

§ 342(g)(1), while such articles are held for sale after shipment of one or more of their components in interstate commerce;

    C. violating 21 U.S.C. § 331(d) by introducing or delivering for introduction, or causing to be introduced or delivered for introduction, into interstate commerce new drugs, within the meaning of 21 U.S.C. § 321(p), that are neither approved pursuant to 21 U.S.C. § 355(a) nor exempt from approval pursuant to 21 U.S.C. § 355(i); and

    D. violating 21 U.S.C. § 331(a) by introducing or delivering for introduction, or causing to be introduced or delivered for introduction, into interstate commerce drugs that are misbranded under 21 U.S.C. § 352(f)(1).

## JURISDICTION AND VENUE

  2. This Court has jurisdiction over the subject matter and all parties to this action under 21 U.S.C. § 332(a) and 28 U.S.C. §§ 1331, 1337, and 1345.

  3. Venue in this district is proper under 28 U.S.C. § 1391(b) and (c).

## PARTIES

  4. Plaintiff is the United States of America. Through FDA, the United States protects the public health by, *inter alia*, ensuring the safety of the U.S. food supply, including assessing dietary supplements for compliance with current good manufacturing practice requirements and proper labeling, and ensuring the safety and efficacy of drugs.

  5. Defendant ABH Nature's Products, Inc. ("ABH Nature's Products") is a New York corporation with its principal place of business at 131 Heartland Boulevard, Edgewood, New York (the "Edgewood Facility"), located in this District. ABH Nature's Products, a contract manufacturer, receives components in interstate commerce and manufactures and distributes or causes the distribution in interstate commerce of numerous dietary supplements and drugs. The

dietary supplements and/or drugs manufactured, prepared, packed, repacked, labeled, held, and/or distributed by ABH Nature's Products and its affiliates are sold under various brand names, including, among others, Adapt, BioFinest, Crystal Star, Fitime, Formula 168, Heart Your Heart, Keto, Precision Naturals, and Prometheus Wellness.

6. Defendant ABH Pharma, Inc. ("ABH Pharma") is a New York corporation with its principal place of business at the Edgewood Facility. ABH Pharma acts as the marketing and sales arm for ABH Nature's Products. It takes sales calls, distributes products manufactured by ABH Nature's Products in interstate commerce, and performs billing services. ABH Pharma also operates the website www.abhpharma.com, through which it promotes ABH Nature's Products' contract manufacturing services and products. ABH Pharma shares employees with ABH Nature's Products.

7. Defendant StockNutra.com, Inc. ("StockNutra") is a Delaware corporation that is registered to do business in New York. StockNutra's principal place of business is the Edgewood Facility. StockNutra's website, www.stocknutra.com, identified StockNutra as a subsidiary of ABH Pharma. ABH Pharma has used the StockNutra name for marketing purposes. StockNutra promotes, offers to sell, and takes customer orders for stock supplements (e.g., vitamins, protein powder, collagen, turmeric, various oils, and joint formulas) manufactured or packaged by ABH Nature's Products. StockNutra causes the distribution of dietary supplements in interstate commerce. It takes orders for dietary supplements through its website (www.stocknutra.com), which ABH Pharma fulfills and distributes in interstate commerce. StockNutra shares employees with ABH Nature's Products and ABH Pharma.

8. Defendant Mohammed "Md." Jahirul Islam ("Islam") resides in Flushing, New York. At all relevant times, Islam has been the owner and President of ABH Nature's Products,

and an owner and Chief Executive Officer of ABH Pharma. Islam oversees ABH Nature's Products and ABH Pharma's operations. Islam's principal place of business is at the Edgewood Facility.

9. Defendants have been and are now engaged in the business of manufacturing, packaging, holding, and/or distributing or causing the distribution of (i) dietary supplements within the meaning of 21 U.S.C. § 321(ff), and (ii) drugs within the meaning of 21 U.S.C. § 321(g)(1).

10. Defendants' dietary supplements are manufactured from components received from outside the state of New York including, but not limited to, California and New Jersey. Defendants distribute and/or cause the distribution of their dietary supplements and drugs into interstate commerce outside the state of New York including, but not limited to, to Missouri and Florida.

## DEFENDANTS' VIOLATIONS OF THE ACT

### *Defendants Prepare, Pack, And/Or Hold Adulterated Dietary Supplements*

11. The Act and FDA's implementing regulations require persons and entities that manufacture, package, label, and/or hold dietary supplements to operate in compliance with current good manufacturing practices ("cGMP") for dietary supplements. 21 U.S.C. § 342(g)(1); 21 C.F.R. Part 111. FDA's dietary supplement cGMP regulations set forth processes and procedures that must be followed to ensure, among other things, that dietary supplements meet requirements for identity, purity, strength, and composition. 21 C.F.R. Part 111. Dietary supplements not prepared, packed, or held in conformance with the cGMP regulations are deemed to be adulterated under the Act. 21 U.S.C. § 342(g)(1).

12. FDA most recently inspected Defendants' facility, the Edgewood Facility, between October 26 and November 16, 2018 ("November 2018 inspection"). The November 2018 inspection established that the dietary supplements Defendants manufacture, prepare, pack,

4

repack, label, hold, and/or distribute are adulterated within the meaning of 21 U.S.C. § 342(g)(1), because they are prepared, packed, and/or held in a manner that violates the dietary supplement cGMP regulations.

13. During the November 2018 inspection, an FDA investigator observed significant deviations from the dietary supplement cGMP regulations, including but not limited to, the following:

    A. Failure to conduct at least one appropriate test to verify the identity of a dietary ingredient, as required by 21 C.F.R. § 111.75(a)(1)(i);

    B. Failure to verify that finished batches of dietary supplements meet product specifications for identity, purity, strength, and composition, as required by 21 C.F.R. § 111.75(c);

    C. Failure to implement a system of production and process controls that covers all stages of manufacturing, packaging, labeling, and holding of dietary supplements to ensure the quality of the dietary supplement (21 C.F.R. § 111.55);

    D. Failure to include required information in batch production records, as required by 21 C.F.R. § 111.260; and

    E. Failure to properly review and investigate a consumer complaint, as required by 21 C.F.R. § 111.560(c).

14. Defendants violate 21 U.S.C. § 331(a) by introducing or delivering for introduction, or causing the introduction or delivery for introduction, into interstate commerce of articles of food (dietary supplements) that are adulterated within the meaning of 21 U.S.C. § 342(g)(1).

15. Defendants violate 21 U.S.C. § 331(k) by causing articles of food (dietary supplements) to become adulterated within the meaning of 21 U.S.C. § 342(g)(1), while such articles are held for sale after shipment of one or more of their components in interstate commerce.

### *Defendants Distribute Unapproved New Drugs*

16. Defendants also violate the Act by introducing or delivering for introduction into interstate commerce "new drugs" that are not FDA approved.

17. The Act defines "drug" as including any products that are "intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease . . . ." 21 U.S.C. § 321(g)(1)(B).

18. Under the Act, a "drug" is a "new drug" if, *inter alia*, "the composition . . . is such that such drug is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof." 21 U.S.C. § 321(p)(1).

19. Under the Act, no person shall introduce or deliver for introduction into interstate commerce any "new drug," unless FDA has approved a new drug application ("NDA") or an abbreviated NDA for that drug, or the drug is exempt from approval under an investigational NDA. *See* 21 U.S.C. § 355(a), (b), (i), and (j).

20. Defendants distribute or deliver for distribution various products that meet the definition of "drug" under the Act, based on Defendants' claims regarding those products. Specifically, FDA has reviewed the product labeling, within the meaning of 21 U.S.C. § 321(m), for several of Defendants' products, including labeling that appeared on Defendants' website, www.stocknutra.com. For many of Defendants' products, the labeling included claims that the product is for use in the cure, mitigation, treatment, or prevention of disease. The following are several examples of such claims, among others made by Defendants:

A. CoQ 10 100mg (white); CoQ10 with organic olive oil 100 mg: "*Free radicals contribute to . . . the development of health problems, such as heart disease and cancer . . . CoQ10 may help with heart-related conditions by . . . prevent[ing] the formation of blood clots*";

B. Odorless Garlic and Parsley Softgel / Odorless Garlic Extract 500MG: "*The active ingredient in garlic, allicin, has antimicrobial properties that protect against bacteria, fungi, and viruses . . . . Consumers can enjoy the benefits of garlic without bad breath with Odorless Garlic Extract 500MG*";

C. Vitamin D products: "*Our Private Label Vitamin D Supplements Marketed for IBS [irritable bowel syndrome] relief*"; "*Vitamin D . . . does help with depression and anxiety.*"; "*Vitamin D supplementation reduces depression symptoms*"; "*Vitamin D3 with Organic Coconut Oil . . . contains monosaturated fatty acids . . . which is a type of healthy dietary fat that may help lower the risk of heart disease by improving associated risk factors*"; "*Vitamin D3 . . . is involved in . . . reducing inflammation*";

D. Stock K2+D3+Bioperine: "*If you have heart disease and are wondering if vitamin K2 will help reduce heart disease the answer is quite possibly*";

E. Krill Oil: "*Consumers have relied on the omega-3 fatty acids in krill oil to support good health in ways that reduce the risk of heart disease, high triglycerides, high cholesterol, high blood pressure, stroke, osteoarthritis, depression*"; "*the fatty acids in Krill Oil 500 MG decrease swelling and lower cholesterol. These fats may also reduce the stickiness of blood platelets, which makes the platelets less likely to form dangerous blood clots*";

7

F. Whey Protein (chocolate and vanilla flavors): "*Whey protein in the form of protein powder can help in reducing the symptoms associated with anxiety and depression*"; and

G. Horny Goat Weed Extract with Maca & Tribulus: "*Does Horny Goat Weed Really Work? Preventing Cancer . . . Horny goat weed has the ability to inhibit excess blood vessel growth, meaning it prevents cancerous tumor development all over the body.*"; "*One very common reason for horny goat weed manufacturing is to battle osteoporosis. It's a well-known herb in terms of treatment for this condition . . . the plant doesn't just fight osteoporosis, but eases joint pain, too*"; "*Some examples of conditions that can be treated by horny goat weed are bronchitis, kidney and liver diseases, high blood pressure, HIV and AIDs . . . .*"

21. Defendants' products also qualify as "new drugs" under the Act. There are no published adequate and well-controlled investigations showing that any of Defendants' drugs are generally recognized as safe and effective for any use. Qualified experts have not (and cannot, without sufficient investigations) come to a consensus opinion concerning the safety and effectiveness of these products for use under the conditions prescribed, recommended, or suggested in the labeling thereof.

22. Defendants' "new drugs" are not approved by FDA. According to FDA's review of its records, none of Defendants' drugs has been the subject of an NDA, abbreviated NDA, or investigational NDA.

23. Accordingly, Defendants violate 21 U.S.C. § 331(d) by introducing or delivering for introduction, or causing to be introduced or delivered for introduction, into interstate commerce

new drugs, as defined by 21 U.S.C. § 321(p), that are neither approved pursuant to 21 U.S.C. § 355(a), nor exempt from approval pursuant to 21 U.S.C. § 355(i).

### *Defendants Distribute Misbranded Drugs*

24. Defendants also violate 21 U.S.C. § 331(a) by introducing or delivering for introduction, or causing to be introduced or delivered for introduction, into interstate commerce drugs that are misbranded within the meaning of 21 U.S.C. § 352(f)(1).

25. Under the Act, a drug is misbranded unless its labeling bears "adequate directions for use" or the drug meets an applicable exemption from the "adequate directions for use" requirement. 21 U.S.C. § 352(f)(1).

26. "Adequate directions for use" is defined as "directions under which the layman can use a drug safely and for the purposes for which it is intended." 21 C.F.R. § 201.5. "Prescription drugs," as defined under the Act, cannot have "adequate directions for use," as defined by 21 C.F.R. § 201.5, because prescription drugs are not safe for lay use but must be used under supervision of a duly licensed practitioner. *See* 21 U.S.C. § 353(b)(1) (defining "prescription drug" as a drug that, "because of its toxicity or other potentiality for harmful effect, or the method of its use, or the collateral measures necessary to its use, is not safe for use except under the supervision of a practitioner licensed by law to administer such drug . . . ."). Accordingly, "prescription drugs" are misbranded unless an exemption from the "adequate directions for use" requirement applies.

27. Many of Defendants' drugs meet the definition of "prescription drugs" under the Act because Defendants claim those drugs are intended for curing, mitigating, treating, or preventing medical conditions that require diagnosis and management by a physician, including, among other conditions, heart disease, depression, and cancer.

9

28. Defendants' prescription drugs also do not meet any applicable exemptions from the "adequate directions for use" requirement. That is because, as noted above, Defendants' drugs are not FDA approved, and thus do not bear the labeling and information authorized by an approved NDA. *See* 21 C.F.R. §§ 201.100(c)(2), 201.115.

29. In addition, it is not possible to write adequate directions for use for Defendants' drugs because such directions – including dosages, indications, contraindications, warnings, side effects, and necessary collateral measures – must be premised on animal and clinical data derived from extensive, scientifically controlled testing. As noted above, there are no well-controlled clinical test data for any of Defendants' drugs.

30. Accordingly, Defendants' drugs are misbranded within the meaning of 21 U.S.C. § 352(f)(1), and Defendants violate 21 U.S.C. § 331(a) by introducing or delivering for introduction into interstate commerce, or causing to be introduced or delivered for introduction into interstate commerce, misbranded drugs.

## **DEFENDANTS' HISTORY OF VIOLATIONS OF THE ACT**

31. Many of the dietary supplement cGMP deviations observed during FDA's November 2018 inspection are the same as or similar to those observed by FDA during at least five previous inspections of Defendants' Edgewood Facility, including inspections that occurred in or about July 2012; May 2013; August 2013; November 2016; and February 2018. For instance, FDA observed the following significant cGMP deviations, among others, during its February 2018 inspection of the Edgewood Facility:

    A. Failure to conduct at least one appropriate test to verify the identity of a dietary ingredient, as required by 21 C.F.R. § 111.75(a)(1)(i);

10

    B. Failure to verify that finished batches of dietary supplements meet product specifications for identity, purity, strength, and composition, as required by 21 C.F.R. § 111.75(c); and

    C. Failure to follow written procedures for laboratory operations, as required by 21 C.F.R. § 111.303.

  32. FDA has repeatedly warned Defendants about their ongoing deviations from the dietary supplement cGMP regulations. FDA investigators issued Lists of Inspectional Observations ("Form FDA-483s") to Defendants at the close of each of the six FDA inspections noted above, notifying Defendants that each inspection revealed significant deviations by Defendants from the dietary supplement cGMP regulations.

  33. Following FDA's July 2012 inspection, FDA issued Defendant Islam a Warning Letter, dated October 24, 2012, detailing deviations from the dietary supplement cGMP regulations observed during the inspection. The dietary supplement cGMP deviations noted in the Warning Letter were the same as or similar to those observed during FDA's November 2018 Inspection. The Warning Letter cautioned that failure to promptly correct deviations could lead to future enforcement action, including an injunction.

  34. FDA held a regulatory meeting with Defendant Islam and his management team on March 23, 2017 and discussed with them the deviations from the dietary supplement cGMP regulations observed by FDA at the Edgewood Facility.

  35. At the close of the November 2018 inspection, an FDA investigator met with Defendants' management team to discuss claims appearing on Defendants' website and in Defendants' promotional literature that appeared to demonstrate that Defendants' products were drugs.

36. In responding to the Form FDA-483 provided to Defendants at the conclusion of the November 2018 inspection, Defendants stated that ABH Nature's Products "does not dispute any of [FDA's] inspectional observations."

37. Defendants repeatedly promised to correct their deviations from dietary supplement cGMP regulations. Defendants made such promises in their written responses to FDA's inspectional observations from each of the six FDA inspections noted above, and in discussion with FDA during the 2017 regulatory meeting.

38. Yet, despite these promises, each new FDA inspection has revealed that Defendants continue to deviate from dietary supplement cGMP regulations. Far from correcting the deviations, Defendants have expanded their unlawful conduct, including by distributing unapproved new drugs and misbranded drugs in violation of the Act.

39. Defendants' violations of the Act and failures to comply with cGMP regulations pose a risk to public health. Indeed, three finished dietary supplements that ABH Nature's Products manufactured or packaged have been the subject of voluntary recalls, in June 2017 and January 2018, due to possible *Salmonella* contamination.

40. Based on the foregoing, Plaintiff believes that, unless restrained by this Court, Defendants will continue to violate the Act in the manner set forth above.

41. Defendants' history of violations of the Act and resistance to FDA's efforts to bring Defendants into compliance with the Act demonstrate that injunctive relief is not only appropriate here to secure compliance with the Act, but also needed to protect consumers.

## CAUSE OF ACTION
## CLAIM FOR INJUNCTIVE RELIEF

42. Plaintiff repeats and incorporates each of the foregoing paragraphs as if fully set forth herein.

43. Defendants violate 21 U.S.C. § 331(a) by introducing or delivering for introduction, or causing to be introduced or delivered for introduction, into interstate commerce articles of food (dietary supplements) that are adulterated within the meaning of 21 U.S.C. § 342(g)(1) because they have been prepared, packed, or held under conditions that do not meet cGMP regulations, 21 C.F.R. Part 111.

44. Defendants violate 21 U.S.C. § 331(k) by causing articles of food (dietary supplements) that Defendants hold for sale after shipment of one or more of their components in interstate commerce to become adulterated within the meaning of 21 U.S.C. § 342(g)(1).

45. Defendants violate 21 U.S.C. § 331(d) by introducing or delivering for introduction, or causing to be introduced or delivered for introduction, into interstate commerce new drugs, within the meaning of 21 U.S.C. § 321(p), that are neither approved pursuant to 21 U.S.C. § 355(a) nor exempt from approval pursuant to 21 U.S.C. § 355(i).

46. Defendants violate 21 U.S.C. § 331(a) by introducing or delivering for introduction, or causing to be introduced or delivered for introduction, into interstate commerce drugs that are misbranded under 21 U.S.C. § 352(f)(1).

47. Defendants' history of cGMP deviations and failure to take corrective action after receiving Form FDA-483s and an FDA Warning Letter suggest there is a reasonable likelihood that these deviations will recur, and that Defendants will continue to violate the Act, unless the United States' requested injunctive relief is granted.

48. Upon a showing that the Defendants are violating 21 U.S.C. § 331, the United States may obtain preliminary and permanent injunctions enjoining such violations. 21 U.S.C. § 332(a).

49. As a result of the foregoing, Defendants' conduct should be enjoined pursuant to 21 U.S.C. § 332.

## PRAYER FOR RELIEF

**WHEREFORE**, the United States respectfully requests, pursuant to 21 U.S.C. § 332(a) and the inherent equitable authority of the Court, that the Court issue an Order and Final Judgment, ordering:

I. Defendants, and each and all of their directors, officers, agents, representatives, employees, attorneys, successors, and assigns, and any and all persons in active concert or participation with any of them, cease receiving, manufacturing, preparing, packing, repacking, labeling, holding, or distributing articles of dietary supplements unless and until:

A. Defendants' facilities, methods, processes, and controls used to receive, manufacture, prepare, pack, repack, label, hold, and distribute dietary supplements are established, operated, and administered in conformity with dietary supplement cGMP regulations and the Act, in a manner acceptable to FDA;

B. Defendants do not cause any dietary supplement that they receive, manufacture, prepare, pack, repack, label, hold, or distribute to be an unapproved new drug within the meaning of the Act, 21 U.S.C. § 321(g)(1)(B), unless and until the product is the subject of an approved new drug application or abbreviated new drug application, or is exempt from approval under an investigational new drug application, 21 U.S.C. § 355(a), (b), (i), and (j); and

      C.  Defendants do not cause any dietary supplement that they receive, manufacture, prepare, pack, repack, label, hold, or distribute to be a misbranded drug within the meaning of the Act, 21 U.S.C. § 352(f)(1).

II.      Defendants, and each and all of their directors, officers, agents, representatives, employees, attorneys, successors, and assigns, and any and all persons in active concert or participation with any of them, be preliminarily and permanently restrained and enjoined under 21 U.S.C. § 332(a) from directly or indirectly doing or causing to be done any of the following acts:

      A.     Violating 21 U.S.C. § 331(a) by introducing or delivering for introduction, or causing to be introduced or delivered for introduction, into interstate commerce articles of food (including but not limited to dietary supplements and their components) that are adulterated within the meaning of 21 U.S.C. § 342(g)(1);

      B.     Violating 21 U.S.C. § 331(k) by causing articles of food (including but not limited to dietary supplements and their components) to become adulterated within the meaning of 21 U.S.C. § 342(g)(1) while such articles are held for sale after shipment of one or more of their components in interstate commerce;

      C.     Violating 21 U.S.C. § 331(d) by introducing or delivering for introduction, or causing to be introduced or delivered for introduction, into interstate commerce new drugs, as defined by 21 U.S.C. § 321(p), that are neither approved pursuant to 21 U.S.C. § 355(a) nor exempt from approval pursuant to 21 U.S.C. § 355(i); and

      D.     Violating 21 U.S.C. § 331(a) by introducing or delivering for introduction, or causing to be introduced or delivered for introduction, into interstate commerce articles of drug that are misbranded within the meaning of 21 U.S.C. § 352(f)(1).

      III.    FDA be authorized pursuant to this injunction to inspect Defendants' place(s) of business and all records relating to the receipt, manufacturing, preparing, packing, labeling, holding, and distribution of all of Defendants' dietary supplements (and their components) and drugs to ensure continuing compliance with the terms of the injunction, and that Defendants bear the costs of such inspection(s) at the rates prevailing at the time the inspection(s) are accomplished;

      IV.    Defendants recall and destroy, under FDA's supervision, all dietary supplements (including components, raw and in-process materials, and finished products) and drugs (including components, raw and in-process materials, and finished products) that Defendants received, manufactured, prepared, packed, repacked, labeled, held, or distributed at any time until the date of final judgment in this action, with Defendants to bear the costs of recall and destruction and the costs of FDA's supervision;

      V.    The United States be awarded the costs and expenses it incurred in investigating and prosecuting this action; and

VI.  The United States be awarded such other and further relief as the Court deems just and proper.

Dated: December 18, 2019
   Brooklyn, New York

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

*/s/ Evan P. Lestelle*
EVAN P. LESTELLE
Assistant United States Attorney
United States Attorney's Office
Eastern District of New York
271-A Cadman Plaza East
Brooklyn, New York 11201
(718) 208-1192
Evan.Lestelle@usdoj.gov

JOSEPH H. HUNT
Assistant Attorney General

DAVID M. MORRELL
Deputy Assistant Attorney General

GUSTAV W. EYLER
Director
Consumer Protection Branch

*/s/ Joshua A. Fowkes*
JOSHUA A. FOWKES
Trial Attorney
Consumer Protection Branch
Department of Justice, Civil Division
450 5th Street, NW, Suite 6400-South
Washington, D.C. 20530
(202) 532-4218
Joshua.A.Fowkes@usdoj.gov

Of Counsel:

ROBERT P. CHARROW
General Counsel

STACY CLINE AMIN
Chief Counsel
Food and Drug Administration
Deputy General Counsel
Department of Health and Human Services

17

ANNAMARIE KEMPIC
Deputy Chief Counsel, Litigation
Food and Drug Administration

WILLIAM THANHAUSER
Associate Chief Counsel, Litigation
United States Department of Health and
Human Services
Office of the General Counsel
Food and Drug Division
10903 New Hampshire Avenue
Bldg. 32, Room 4397
Silver Spring, MD 20993-0002
Phone: (301) 348-3052
William.Thanhauser@fda.hhs.gov